IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOSEPH POTOSKI, JAMES MONSUER, :
RICHARD R. CHABALA, JOSEPH C. :
BOKAR, JOSEPH L. PACE, PATRICK :
O'DONNELL :
      Plaintiffs :
  v. : 3:CV-06-2057
      : (JUDGE VANASKIE)
WILKES UNIVERSITY :
      Defendant :

MEMORANDUM

Pending in this employment discrimination lawsuit is the Motion for Summary Judgment of Defendant Wilkes University ("Wilkes"). (Dkt. Entry 46.)[1] Plaintiffs Joseph Potoski, James Monsuer, Richard Chabala, Joseph Bokar, Joseph Pace, and Patrick O'Donnell were employed by Wilkes in a campus security capacity until they were terminated on July 7, 2003. Claiming their termination was due to their age, Plaintiffs filed a complaint in this Court asserting Wilkes violated the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621, et seq., and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. Ann. § 951,[2] et seq. (Dkt.

---

[1] For the convenience of the reader of this Memorandum opinion in electronic format, hyperlinks to the Court's record and to authority cited herein have been inserted. The Court accepts no responsibility for, and does not endorse, any product, organization, or content at any hyperlinked site, or at any site to which that site might be linked. The Court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the Court.

[2] Specifically, Plaintiffs' allege violations of § 955.

Entry 1.)³ Wilkes denies Plaintiffs' allegations, contending that Plaintiffs' positions were eliminated as a result of the reorganization of the Security Department into the newly created Public Safety Department. For the reasons that follow, Wilkes' motion will be denied.

I.   BACKGROUND⁴

In 1947 Wilkes College received its charter as a four-year liberal arts college, and in 1990 it attained its status as a University. (Def.'s Statement of Material Facts ("DSMF"), Dkt. Entry 48, ¶ 1.) Plaintiffs Potoski (age 54),⁵ Monsuer (age 47),⁶ Chabala (age 56), Bokar (age 45),⁷ Pace (age 50), and O'Donnell (age 50) were hired between November 1990 and September 2001 as "Security Persons." (DSMF, ¶¶ 2-7.) Plaintiffs were labeled "Public Safety Officers" at the time of their termination on July 7, 2003. (Pltfs.' Counter Statement of Material Facts ("PSMF"), Dkt. Entry 54, ¶¶ 2-7.)

In 2000, Wilkes engaged the services of The Oxford Group to study various aspect of its

---

³ This Court has jurisdiction over the ADEA claim pursuant to 28 U.S.C. § 1331, and over the PHRA claim pursuant to 28 U.S.C. § 1367(a).

⁴ Because Plaintiffs denied/disputed the majority of Defendant's Statement of Material Facts, the Court has combed the record for undisputed facts, as well as noted the parties disagreements where pertinent.

⁵ All ages are expressed as of the time of the termination of employment

⁶ Wilkes states that Monsuer was 48 years old when he was discharged. (Def. Answer Interrog. #11.)

⁷ Wilkes states that Bokar was 46 years old when he was discharged. (Def. Answer Interrog. #11.)

2

operations. The Oxford Group issued on September 1, 2000, a draft "Report and Recommendations Concerning the Analysis of the Contracting/Purchasing, Risk Management and Security Departments of Wilkes University" ("Oxford Group Report"). (DSMF, Ex. "J".) The goal of the Oxford Group Report was to achieve "cost-effective improvements in service in [the above-mentioned] departments . . . [and] examine these areas to determine whether these departments are fulfilling their duties to the University community." (Id. at 1.) Under the recommendations heading, The Oxford Group Report stated that most academic communities employ "the much broader term Campus Safety as opposed to security. This is not merely a change in terminology but rather, an expansion of the role of this department." (Id. at 13.) The report, inter alia, noted the lack of oversight in the daily functioning of the security department and the large gaps in time between the security officers' rounds. The report also observed that it was unclear what the Chief of Security accomplished throughout any given day, and training of security personnel needed to be expanded so that they could be up to date on CPR. (Id. at 13-14.)

In February 2002, Wilkes hired Scott Byers as its Vice president of Finance and Support. (DSMF, ¶ 16.) According to Wilkes, and vigorously disputed by Plaintiffs, Byers was directed to evaluate and reorganize various departments, including the Security Department. (Id.)

In the Spring of 2002, Wilkes commissioned a Campus Services Study. (Id., Ex. "L".)

3

The Campus Services Study was part of Wilkes' initiative to develop an "exceptional support environment for students, faculty, and staff." (Id., Ex. "L", at Wilkes-0416.) Campus Security was one of twelve campus services surveyed by the faculty, staff, and students. (Id. at Wilkes-0418.) Overall, the respondents' experience with Campus Security was excellent (20.2%), good (40.0%), average (25.9%), fair (8.8%), and poor (5.1%). (Id. at Wilkes-0528.) A number of comments regarding Campus Security, some favorable and others disparaging, were posted as part of the survey. (Id. at Wilkes-0529-Wilkes-0534.)

In October 2002, the Oxford Group conducted another study for Wilkes, titled the "Results of a Survey of Comparably Sized College Security Departments." (Id., Ex. "M".) The purpose of the study was "to learn how other colleges and universities are reacting to the demands on today's campuses in order to help officials at Wilkes University design its new security department." (Id.) This study noted that Wilkes had started implementing some of the recommendations in the September 2000 Oxford Group Report, including searching for a new head of the Security Department. (Id. at Wilkes-5945.) The October 2002 Report also stated that Wilkes was "looking to upgrade the professional level of the department personnel, and possibly create a 'career ladder'" for officers in this field. (Id.) Three institutions, Misericordia, Muhlenberg, and York Colleges, participated in the survey. (Id. at Wilkes-5946.)

In September 2002, Wilkes hired Christopher Bailey as the Director of Public Safety. (DSMF, at ¶ 22.) Bailey held the title of Director throughout all pertinent times in 2002 and

2003.  (Id., Ex. "N", Bailey Depo. at 8:2-14.)  Mr. Bailey reported to Mr. Byers.  (Id. at 7:17-18; 10:24-11:3.)  Bailey's duties and responsibilities were to "oversee the operations of the Public Safety Department, which included the traditional security operations . . . ."  (Id. at 8:15-20.)

According to Mr. Bailey, "some time in the neighborhood of the end of May or beginning of June[] 2003[,]" Mr. Byers decided to terminate all of the security officers on July 7, 2003.  (Id. at 17:15-21.)  Responding to questioning about his discussions with Byers concerning the terminations, Bailey stated:

> Basically, I went over what steps we had already taken to try to move the department, to enhance the department in the eyes of the community, what had already occurred from the time of my hiring until that point, and we reviewed the fact that it didn't seem to be effective.

(Id. at 18:24-19:8.)  Bailey testified that before and after July 7, 2003, Plaintiffs' titles were "public safety officer[s,]" as "[w]e" were attempting to move away from "the term 'security guard'" . . . .(Id. at 38:19-39:5.)

On July 3, 2007, Plaintiffs were required to attend a meeting for all Public Safety Officers.  (PSMF, Ex. "19".)  At this meeting, all Public Safety Officers were informed that their positions were being eliminated,[8] but that they could apply for the "newly created" position of

---

[8] The fifteen employees terminated, with their ages in parentheses, were: Potoski (54), O'Donnell (51), Coyne (39), Pace (50), Monsuer (48), Chabala (57), Edward Lasecki (63), Joseph Whitley (34), Christopher Banks (40), Curtis Loyd (34), Scott Howell (18), Madi Bobb (36), Edward Templeton (68), Joseph Pace (50), and Ronald Rebo (55).  (PSMF, Ex. "21", Def's. Answer Interrog. #11.)

5

PSO 1.[9]  (See Pltfs.' Compl. ¶¶ 66-7; Def's. Answer ¶¶ 66-7.)  All officers were provided with a general release which they were instructed to sign.  (See, e.g. PSMF, Ex. "9", Chabala Depo. 70:17-71:8.)  Also, according to Plaintiffs, they were instructed to return their equipment, and immediately leave the premises of the campus.  (Id. at 71:10-15.)

On July 8, 2003, interviews commenced for those who reapplied.[10]  (DSMF, ¶ 31.)  Chris Bailey, Matthew Yencha, Michael Malkemes, and Gerald Rebo interviewed the candidates. (PSMF, ¶ 32.)  Wilkes claims, and Bailey testified, that each interview consisted of a set criteria, and the applicants were ranked against each other.  (Id. at ¶ 32, Bailey Depo. 141:2-7, 142:10-143:5.)  Plaintiffs, on the other hand, argue that former employees were interviewed using a PSO interview data sheet, but the same data sheet was amended for other applicants to include an additional five point "modifier" which permitted the interviewers to add points based upon their overall reaction.  (PSMF, ¶ 32.)  Bailey testified, however, that only after the initial interview rounds and the rehiring process, around August or September 2003, were the modifications made.  (Bailey Depo. 158:2-159:7.)

---

[9] Bailey explained that the positions established in the wake of the July terminations were "Public Safety Officer 1, Public Safety Officer 2, and Public Safety Officer 3." (Id. Ex. "N", Bailey Depo. at 39:6-10.)  Public Safety Officer ("PSO") 3 had the greatest responsibilities, such as management; Public Safety Officer 2 was a mid-level officer with day-to-day supervisory responsibilities over Public Safety Officer 1; and Public Safety Officer 1 was the lowest ranking officer.  (See id. at 39:11-40:1.)

[10] All Plaintiffs were invited to reapply for the PSO 1 position after they were fired. (Byers Depo. 67:8-11.)  Of the six Plaintiffs terminated, three reapplied – Chabala, Pace, and O'Donnell.  (PSMF, ¶ 36.)  Bokar, Monsuer, and Potoski did not reapply.  (DSMF, ¶¶ 38-40.)

The following persons, with their ages listed parenthetically, were hired for the position of PSO 1: Scott Howell (18), Donald Bly (21), Brandon Conway (22), Steven Scoble (23), Shawn Partington (24), Leah Senese (27), Paul Walsh (27), Thomas Gernhart (28), Philip Miller (28), Jennifer Klebetz (36), Francis McGrady (36), Daniel Yeager (36), Patrick Coyne (39),[11] and Ronald Rebo (55).[12] Thus, out of the fifteen terminated security officers, only three (Howell, Coyne, and Ronald Rebo) were rehired. Besides Ronald Rebo, and possibly Patrick Coyne, all of the newly hired PSO 1 officers were under the age of 40.

Plaintiffs' expert, Richard Nardone, in a report dated January 28, 2008, concluded that "age played a significant role in the adverse employment action by Wilkes against [Plaintiffs] and that the June 2003 PSO-1 job description and July 7th reorganization of the department was a pretext for unlawful age discrimination." (PSMF, Ex. "17" ("Nardone Report") at 2.) Nardone asserts that Plaintiffs had been satisfactorily performing their work according to their performance reviews, and "had Wilkes not changed the job description the preceding month, [Plaintiffs] would not have been dismissed." (Id. at 1.) Comparing the job descriptions that

---

[11] There is a dispute as to how old Patrick Coyne was at the time of his hiring. Plaintiffs' assert that he was 39 years old. (PSMF, ¶ 44(a).) One of Defendant's experts lists Coyne as 40 years old, and Defendant's Answers to Interrogatories list Coyne as 40 years old at the time of termination. (DSMF, Ex. "U", App. "A"; Def. Answer Interrog. #11.)

[12] Ronald Rebo is the brother of Gerald "Jerry" Rebo, a supervisor, and later Public Safety Manager, in the Public Safety Department who reported to Mr. Byers. (Bailey Depo. 36:19-38:1.) Ronald Rebo was fired with the other security officers, reapplied for the job, and was rehired as a PSO 1. (See DSMF, Ex. "U", App. "A".)

7

were in place before June 2003 with the change in job description effectuated in June, 2003, the report stated that there were no material differences between the two.  (Id.)  For the differences between the positions, such as "riding a bike for an extended periods of time, ability to run short periods, and good oral and written communication skills, management offered no quantitative measurable performance standards that needed to be met."  (Id.)

Regarding the department reorganization, Nardone opines that "reorganization of the department did not take place, at least to the extent that [Plaintiffs] would be impacted."  (Id. at 2.)  Instead of a department reorganization, the Nardone report declares the July 7, 2003, meeting was to announce a revised job description, sever all security employees, and pronounce the opportunity to reapply for the PSO 1 position.  (Id.)  Further, the report asserts that the release from liability was not effective, the failure to rehire the three Plaintiffs who applied pointed to "a prima facie case of age discrimination[,]" and the PSO 1 job description and reorganization meeting were "pretext[s] for unlawful age discrimination."  (Id.)  In October 2008, Nardone authored a supplemental report confirming his opinions issued in the original expert report.  (PSMF, Ex. "17", Nardone Supp. Expert Report at 2.)

Wilkes' expert, Dr. Frank Landy, whose doctorate is in Industrial and Organizational Psychology, issued a report primarily countering the Nardone Report.  (DSMF, Ex. "O", ("Landy Report".))  Landy "summarized" eleven points made by Nardone, and responded to each one as to why they were incorrect.  In short, Landy asserted that: (1) for several reasons, although

8

past satisfactory performance may play a role in the hiring process, it often does not; (2) Wilkes created a clear job description, afforded equal opportunity for each applicant during the hiring process, and Wilkes was not obliged to consider current employees as "best applicants" for purposes of rehiring; (3) reorganization can be defined as "either re-organization/re-definition of essential functions for a job, or the re-organization of the mission of the entity, or both";[13] (4) Wilkes, by permitting all former employees to reapply, conducted the "most efficient mechanism to make the transformation from a 1995 view of campus security to a 2003 view of campus public safety"; (5) by comparing the job descriptions from the 1995 security officer with the 2003 public safety officer, "clear and palpable" differences between the two are apparent; (6) performance standards measure how one actually performs and play a minor role in hiring an individual; (7) the allegation that the termination of all current campus security officers was a pretext for unlawful age discrimination is simply unfounded; (8) Plaintiffs Chabala, Pace, and O'Donnell, who did reapply, were not predestined to not receive offers; (9) Ron Rebo, a retired police officer and brother of the head of the Public Safety Department, met the minimum qualifications standards and was not given preferential treatment, nor does Wilkes have a policy forbidding the hiring of relatives; (10) there is no evidence suggesting that age played a

---

[13] Landy claims, in sections 7(c) and 7(g) of his report, that had Nardone reviewed various reports that Landy had in his possession, Nardone's opinions would have been different. (Landy Report at 3, 5.) Nardone, in his supplemental report issued after reviewing a number of additional materials, observed that "he did not find any reason to change" his opinion as stated in his January 2008 report. (Nardone Supp. Expert Report at 2.)

role in the termination of, and later hiring of, persons for the PSO 1 position; and (11) the July 2003, job description was not a pretext for unlawful age discrimination. (See id. at 2-7.)

Dr. Bernard Sisken, another expert retained by Wilkes, performed a statistical analysis concerning the "former employees who applied for the redesigned position and the new candidates who applied and were offered the position . . . ." (DSMF, Ex. "U", at 2 ("Sisken Report".)) Sisken concluded:

> (i) the process did not have a disparate [impact] on older workers;
> (ii) there is no valid statistical evidence that age was a factor in the likelihood of a former employee applying for the new position;
> (iii) among those former employees applying for the position, the selection process did not have a disparate impact on older former employees;
> (iv) irrespective of whether or not the former employees applied for the position, the selection process did not have a disparate impact on older former employees;
> (v) the decision of whom to interview from among all applicants did not have a disparate impact on older applicants;
> (vi) the selection of whom to offer a position from among those interviewed did not have a disparate impact upon older interviewees;
> (vii) among all applicants for the new position, the selection process did not have a disparate impact on older applicants; and
> (viii) while Dr. Nardone's analysis is not statistical, it seems to be premised on the incorrect assumption that the action taken by Wilkes University had a disparate impact upon older workers.

(Sisken Report at 2.) Plaintiffs dispute the accuracy, reliability, and conclusions contained in the report. (PSMF, ¶¶ 41-44.)

II. DISCUSSION

A. Summary Judgment Standard

Summary judgment should be granted when "the pleadings, the discovery and

10

disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" if proof of its existence or nonexistence might affect the outcome of the suit under the applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party. Cont'l Ins. Co. v. Bodie, 682 F.2d 436, 438 (3d Cir. 1982). The moving party has the burden of showing the absence of a genuine issue of material fact, but the nonmoving party must present affirmative evidence from which a jury might return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 256-57. Mere conclusory allegations taken from the pleadings are insufficient to withstand a motion for summary judgment. Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990). Summary judgment is to be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

B. Age Discrimination Claims

The ADEA declares it unlawful "to discharge any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1); see also 43 Pa. Stat. Ann. § 955(a) (similar prohibition). To succeed on a claim of age discrimination under the ADEA and PHRA, the plaintiff "must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." Gross v. FBL Financial Services, Inc., 129 S.Ct. 2343, 2351 (2009). Where, as here, the complaining party relies upon circumstantial evidence to support an age discrimination claim, our Court of Appeals has approved the use of the familiar burden shifting framework announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), a Title VII discrimination case. See Smith v. City of Allentown, 589 F.3d 684, 691 (3d Cir. 2009).[14]

As explained in Smith, the burden shifting approach works as follows:

the plaintiff bears the burden of proof and the initial burden of production, having to demonstrate a prima facie case of discrimination by showing first, that the

---

[14] In Gross, the Court held that an age discrimination plaintiff could not seek to shift the burden of proof to an employer by invoking what is known as the "mixed motives" theory. 129 S. Ct. at 2351-52. As noted by our Court of Appeals in Smith, the majority in Gross expressed ambivalence with respect to the applicability of the burden shifting framework announced in McDonnell Douglas to age discrimination cases. 589 F.3d at 691. Our Court of Appeals held in Smith, however, that Gross "does not forbid . . . adherence to precedent applying McDonnell Douglas to age discrimination claims." Id. Accordingly, the burden shifting paradigm will be applied here. See Ferruggia v. Sharp Electronics Corp., Civil No. 05-5992, 2009 WL 2634925, at *4 (D.N.J. Aug. 25, 2009) (discussing post-Gross impact on motions for summary judgment and holding that it does not affect summary judgment analysis).

12

> plaintiff is forty years of age or older; second, that the defendant took an adverse employment action against the plaintiff; third, that the plaintiff was qualified for the position in question; and fourth, that the plaintiff was ultimately replaced by another employee who was sufficiently younger to support an inference of discriminatory animus. Once the plaintiff satisfies these elements, the burden of production shifts to the employer to identify a legitimate non-discriminatory reason for the adverse employment action. If the employer does so, the burden of production returns to the plaintiff to demonstrate that the employer's proffered rationale was a pretext for age discrimination. At all times, however, the burden of persuasion rests with the plaintiff.

Id. at 689-90 (citations omitted). If the employer offers evidence of a legitimate, non-discriminatory reason for the adverse employment decision, the plaintiff must produce evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).

Wilkes concedes that Plaintiffs are members of a protected class and they suffered an adverse employment action. (Def.'s Br. Supp. Mot. Summ. J. at 17, Dkt. Entry 47.) Wilkes claims that Plaintiffs cannot satisfy the remaining elements of a *prima facie* case, asserting that Plaintiffs were not qualified for the "new position," and they cannot show that they were replaced by sufficiently younger people. (Id.)

The fact that Plaintiffs satisfactorily performed their jobs as Campus Security Officers is clearly sufficient to create a triable issue of fact on whether each was qualified for the PSO 1 position. In this regard, Wilkes has not identified a single functional requirement of the PSO 1

13

position that any Plaintiff was unable to satisfy.  Instead, Wilkes advances the startling proposition that Plaintiffs are not qualified because interviewers concluded that the Plaintiffs who applied for PSO 1 jobs were deemed not the "most" qualified.  Such a proposition, if accepted, would undermine the anti-discrimination laws.  An employer's subjective belief as to who is "most qualified" has nothing whatsoever to do with the question of whether a job claimant can do the job.  Our Court of Appeals has held that "'while objective job qualifications should be considered in evaluating the plaintiff's prima facie case, the question of whether an employee possesses a subjective quality . . . is better left to the later stage of the McDonnell Douglas analysis.'"  Matczak v. Frankford Candy and Chocolate Co., 136 F.3d 933, 938 -39 (3d Cir. 1997) (citing Weldon v. Kraft, 896 F.2d 793, 798 (3d Cir.1990)).  "The rationale behind this position is that subjective evaluations are more susceptible of abuse and more likely to mask pretext and, for that reason, are better examined at the pretext stage than at the prima facie stage."  Id. (internal citations omitted).  Accordingly, Defendant's reliance upon subjective assessments of who was best qualified is unavailing.  Plaintiffs' past performance supplies an adequate foundation for a fact-finder's rational determination that they were qualified for the PSO 1 position.

Defendant also claims that Dr. Sisken's statistical analysis means that Plaintiffs cannot show that they were replaced by sufficiently younger persons to raise an inference of age discrimination.  (Def.'s Br. at 18.)  Plaintiffs, on the other hand, argue that they have a colorable

14

claim which precludes summary judgment because they were replaced by sufficiently younger people. (Pltfs.' Br. at 12.)

Dr. Sisken's analysis may have probative force in a disparate impact case, but this is a disparate treatment case. A simple comparison of Plaintiffs' ages with the ages of the persons hired for the PSO 1 position is enough to satisfy Plaintiffs' burden.

At the time of termination, Plaintiffs were all well over the age of 39: Bokar (45), Monsuer (48), Pace (50), O'Donnell (51), Potoski (54), and Chabala (57). Three former employees from the pool of the terminated officers were rehired – Scott Howell (18), Patrick Coyne (39 or 40), and Ronald Rebo (55). With the exception of Ronald Rebo (the brother of the Public Safety Manager), the favored incumbents are sufficiently younger to raise an inference of age bias. See Sempier v. Johnson & Higgins, 45 F.3d 724, 729 (3d Cir. 1995) (as little as a five year age differential may suffice to raise an inference of age discrimination). Consideration of the ages of the new hires reinforces the conclusion that, at a minimum, Plaintiffs have shown a triable issue on this element of the *prima facie* case. The new officers who were hired were ages: 21 (Donald Bly), 22 (Brandon Conway), 23 (Steven Scoble) 24 (Shawn Partington), 27 (Leah Senese and Paul Walsh), 28 (Thomas Gernhart and Philip Miller), and 36 (Jennifer Klebetz, Francis McGrady, and Daniel Yeager). Thus, comparison of the ages of the new hires, ages 21-36, plus the rehired officers, is sufficient to support a finding that Plaintiffs were replaced by sufficiently younger persons, and therefore, they have satisfied

15

their burden at the summary judgment stage.

Because summary judgment on the Plaintiffs' *prima facie* case is not warranted, the burden shifts to Wilkes to articulate a legitimate, non-discriminatory reason for Plaintiffs' termination. In this regard, Wilkes submits that the reorganization in July 2003, resulted in the newly created Public Safety Department and termination of Plaintiffs' positions. (Def.'s Br. at 21.) Wilkes has met its burden of production.

With Wilkes having offered a legitimate, non-discriminatory reason for Plaintiffs' termination, the burden returns to Plaintiffs. In order to show Wilkes' proffered non-discriminatory reason is pretext, Plaintiffs must produce evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes, 32 F.3d at 764. Here, Plaintiffs stress Defendant's "inconsistent and implausible" arguments as showing that the reorganization was a pretext to replace older workers. Thus, Plaintiffs' assertions will be addressed under the first prong of Fuentes.

The court in Fuentes explained:

To discredit the employer's proffered reason . . ., the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered

16

legitimate reasons for its action that a reasonable factfinder could rationally find them "unworthy of credence," and hence infer that the employer did not act for [the asserted] non-discriminatory reasons.

Id. at 765 (internal citations and quotations omitted).

Plaintiffs argue that the PSO 1 position was not newly created, but rather a "re-titled" security officer in an attempt to disguise Defendant's otherwise illegal termination. (Pltfs.' Br. at 18.) Plaintiffs strenuously claim that this security position was never eliminated. Defendant proclaims, with equal adamance, that the security position was eliminated and the new PSO 1 was formed.

The Tenth Circuit has stated that the "test for position elimination is not whether the responsibilities were still performed, but rather whether the responsibilities still constituted a single, distinct position." Furr v. Seagate Technology, Inc., 82 F.3d 980, 988 (10th Cir. 1996). The newly created PSO 1 position was very similar to the previous campus security officer position. Additionally, there were basically no differences between the purported job descriptions before and after the reorganization. As Gerald Rebo testified:

> Public Safety is going to be public safety. It's not going to change . . . it's how you conduct yourself as a public safety officer and that's what we wanted to get across, that you be professional at all times. It has changed in that it upgraded the public safety department and the officers actions and how they took it . . . . I don't think changes came in public safety. Change came within the officer, the personnel.

(G. Rebo Depo. 139:4-20.)

At his deposition, Bailey testified that there were differences between the campus

17

security officer position and the new PSO 1. (Bailey Depo. 8:7-11.) Bailey, however, acknowledged a number of similarities between the two positions. Also, while the PSO 1 written job description may have contained additional responsibilities as compared to the security officer position, the previously labeled security officers were expected to perform the same functions contained in the new PSO 1 position. For example, as to both the old and new position, they were the lowest rank in the department, the work was autonomous, the minimum qualifications were the same, the physical requirements were the same, they were both expected to be able to run for short periods of time, and good oral and written communication skills were expected. (Bailey Depo. at 59:5-14, 77:4-19, 79:3-24, 80:8-20, 92:1-6.) Indeed, the ability to ride a bike and some additional training were the only discernable differences between the positions. Even so, any training that was required for PSO 1 could be obtained within six months of gaining employment with Wilkes, and no person was tested for the ability to ride a bike. Hence, Plaintiffs have provided sufficient evidence demonstrating that the duties of the two positions were so similar that no reorganization actually occurred.

Wilkes relies on the Oxford Group Report, the Student Survey, and their experts' reports to justify "upgrading "to the PSO position within the Campus Safety Department. While the evidence is probative, it does not suffice to preclude a jury from finding that Plaintiffs have discredited Wilkes' reasons for terminating their employment, and that age discrimination was the "but for" factor in its decision.

18

Viewing the evidence in the light most favorable to Plaintiffs and weighing the parties' contentions, this Court finds that a reasonable jury could find that the "reorganization" defense advanced by Wilkes is "unworthy of credence." Moreover, a jury could find that the re-designation of job titles was simply a way to replace older security officers with younger ones. See Waldron v. SL Industries, Inc., 56 F.3d 491, 497 (3d Cir. 1995). Accordingly, summary judgment will be denied. An appropriate order follows.

s/ Thomas I. Vanaskie<br>
Thomas I. Vanaskie<br>
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOSEPH POTOSKI, JAMES MONSUER, RICHARD R. CHABALA, JOSEPH C. BOKAR, JOSEPH L. PACE, PATRICK O'DONNELL | : : : : : | |
| Plaintiffs | : | |
| v. | : : | 3:CV-06-2057 (JUDGE VANASKIE) |
| WILKES UNIVERSITY | : | |
| Defendant | : | |

## ORDER

NOW, THIS 12th DAY OF FEBRUARY, 2010, for the reasons set forth in the foregoing memorandum, IT IS HEREBY ORDERED THAT:

1. Defendant's Motion for Summary Judgment (Dkt. Entry 46) is DENIED.

2. A telephone scheduling conference shall be held on Thursday, March 4, 2010, at 10:00 a.m. Counsel for Plaintiffs is responsible for making the arrangements for the conference call.

s/ Thomas I. Vanaskie
Thomas I. Vanaskie
United States District Judge
